**IN THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS,
SHERMAN DIVISION**

| | | |
|---|---|---|
| **MARK HAMMERVOLD** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | **No. 4:20-CV-00165-ALM** |
| **v.** | § | |
| | § | |
| **DIAMONDS DIRECT USA OF** | § | |
| **DALLAS,  LLC; DAVID BLANK;** | § | |
| **DIAMOND CONSORTIUM, INC.** | § | |
| **d/b/a THE DIAMOND DOCTOR; and** | § | |
| **JEWELERS MUTUAL INSURANCE** | § | |
| **COMPANY** | § | |

<u>**PLAINTIFF MARK HAMMERVOLD'S RESPONSE IN OPPOSITION TO
DEFENDANT DIAMONDS DIRECT'S MOTION TO DISMISS**</u>

**MARK HAMMERVOLD**[1]
Mark Hammervold, IL #6320744
155 S. Lawndale Ave.
Elmhurst, IL 60126
(T) 405.509.0372
(F) 615.928.2264
<u>mark@hammervoldlaw.com</u>

*Pro Se Plaintiff*

---

[1] Mark Hammervold is admitted to practice in this district, but is representing himself *pro se* in this case.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................iii

FACTUAL BACKGROUND....................................................................1

MOTION STANDARD ...........................................................................6

ARGUMENT .........................................................................................7

    **I.**    **Hammervold has Stated a Claim for Abuse of Process**....................................7

    **II.**    **Hammervold's Abuse of Process Claim is Not Time-Barred** .........................12

    **III.**    **Hammervold has Alleged a Special Injury** ......................................................15

        **a.**  **Illinois Law Should Govern Whether Hammervold Suffered a "Special Injury" or "Special Damages" Due to Defendants' Abuse of Process** ......16

        **b.**  **Alternatively, it is Premature to Conclusively Decide the Choice-of-Law Issue Against the Pleader at this Stage of the Case Before Any Discovery and Without Any Evidentiary Record** ........................................................20

        **c.**  **Hammervold has Clearly Alleged Damages Cognizable as a "Special Injury" Under Illinois Law** ..........................................................................21

        **d.**  **Even Under Texas Law, Hammervold has Pled a "Special Injury"** .........22

    **IV.**    **Hammervold has Stated a Claim for Conspiracy Against Diamonds Direct** .25

        **a.**  **Hammervold has Sufficiently Alleged the "Meeting of the Minds" Element** ......................................................................................................25

        **b.**  **Hammervold has Sufficiently Alleged the "Overt Act" Element** .............29

CONCLUSION .....................................................................................30

## TABLE OF AUTHORITIES

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136 (Tex. 2019) ........................ 25

*Aly v. City of Lake Jackson,* 453 Fed. Appx. 538 (5th Cir. 2011).................................... 14-15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)  ........................................................................6

*Baubles v. Beads*, 766 S.W.2d 377 (Tex. App 6th 1989)  ............................................... 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..............................................................6

*Berry v. Indianapolis Life Ins.,* 608 F. Supp. 2d 785 (N.D. Tex. 2009)  ........................... 27-28

*Blanchard & Co., Inc. v. Contursi,* 2000 U.S. Dist. LEXIS 6672 (E.D. La. 2000)....................20

*Bossin v. Towber*, 894 S.W.2d 25 (Tex. App. 14th 1994)  ........................................ 7,8,12

*Bradley v. Phillips Petroleum Co.,* 527 F. Supp. 2d 625 (S.D. Tex. 2007) ............................30

*ChemTreat, Inc. v. Chemtech Chem. Servs.*, 2007 U.S. Dist. LEXIS 90175 (E.D. Tex. Dec. 6, 2007)............................................................................................................25

*Columbia Valley Healthcare Sys., L.P. v. Pisharodi,* 2020 Tex. App. LEXIS 806 (Tex. App. 13th Jan. 30, 2020) ................................................................................... 23,24

*Constantin Land Trust v. Epic Diving & Marine Servs.*, LLC, 2012 U.S. Dist. LEXIS 63645 (E.D. La. May 4, 2012) ...........................................................................................14

*Constr. Cost Data, LLC v. Gordian Grp.*, 2017 U.S. Dist. LEXIS 77481 (S.D. Tex. Apr. 24, 2017).............................................................................................................7

*Crear v. US Bank, NA*, 2015 U.S. Dist. LEXIS 182434 (May 26, 2015)......................... 10,11

*Cult Awareness Network v. Church of Scientology Int'l*, 177 Ill. 2d 267 (Ill. 1997) ...... 17,19,22

*Davis—Lynch, Inc. v. Moreno,* 667 F.3d 539 (5th Cir. 2012)........................................ 29,30

*Dunn v. Koehring Co.* 546 F.2d 1193 (5th Cir. 1977) ..........................................................8

*Durham v. Supreme Court of Tennessee*, 2007 U.S. Dist. LEXIS 23252 (M.D. Tenn. Jan. 29, 2007)............................................................................................................24

*Energy Coal S.P.A. v. Citgo Petroleum Corp.,* 836 F.3d 457 (5th Cir. 2016).........................16

*Erickson v. Pardus*, 551 U.S. 89 (2007)  ........................................................................6

*Floyd v. CIBC World Mkts., Inc.,* 426 B.R. 622 (S.D. Tex. 2009)......................................20

*Gatheright v. Clark*, 680 F. App'x 297 (5th Cir. 2017) .....................................................13

*Greening v. Moran*, 739 F. Supp. 1244 (C.D. Ill. 1990) ....................................................24

*Haynesville Shale Rentals, LLC v. Total Equip. & Serv.*, 2012 U.S. Dist. LEXIS 147297 (S.D. Tex. Oct. 12, 2012)  .........................................................................................21

*Howard v. CitiMortgage,* 2014 U.S. Dist. LEXIS 167842 (S.D. Miss. Dec. 2, 2014) ........ 13,14

*In re Katrina Canal Breaches Litigation*, 495 F.3d 191 (5th Cir. 2007).............................7,24

*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719 (5th Cir. 2018)............................................................................................................27

*Janvey v. Proskauer Rose LLP*, 2015 U.S. Dist. LEXIS 187809 (N.D. Tex. Jun. 23, 2015) ......20

*Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004) ...........................................................27

*Jordan v. Jordan*, 2001 Tex. App. LEXIS 5106 (Tex. App. 5th Jul. 30, 2001) ........................8

*Leaf Trading Cards, LLC v. Upper Deck Co.,* 2020 U.S. Dist. LEXIS 27780 (N.D. Tex. Feb. 19, 2020)............................................................................................................ 20

*Liverman v. Payne-Hall*, 486 S.W.3d 1(Tex. App. 8th 2015)...................................... 8,10,12

*Martin v. Tex. Dep't of Protective & Regulatory Servs.*, 405 F. Supp. 2d 775(S.D. Tex. 2005)..30

*Parsons v. Deutsche Bank Nat'l Trust Co.*, 2019 U.S. Dist. LEXIS 19978 (N.D. Tex. Jan. 22, 2019)................................................................................................................ 19,30

*Partrich v. Farber*, 448 Fed. Appx. 526 (6th Cir. Aug. 24, 2011)........................................8,10

*Patel v. Pac Life Ins.,* 2009 U.S. Dist. LEXIS 44105 (N.D. Tex. 2009) ................................28

*Pitts & Collard v. Schechter,* 369 S.W.3d 301 (Tex. App. 1st 2011)......................................19

*Rothman v. City of Chicago*, 2003 U.S. Dist. LEXIS 8376 (N.D. Ill. May 14, 2003) ...............21

*Samsung Elecs. Am., Inc. v. Chung*, 2017 U.S. Dist. LEXIS 21700 (N.D. Tex. Feb. 16, 2017)..25

*Smith v. Michigan Buggy Co.*, 175 Ill. 619 (1898) ............................................................19

*Southern Audio Servs. v. Carbon Audio, LLC*, 141 F. Supp. 3d 653 (M.D. La. 2015) ........ 20,21

*Tarpley v. Texaco, Inc.,* 1998 U.S. Dist. LEXIS 3482 (N.D. Tex. Mar. 16, 1998) ...................13

*Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203 (Tex. 1996) .................................................23

*Torrington Co. v. Stutzman*, 46 S.W.3d 829 (Tex. 2000)......................................................16

*Toyota Motor Co. v. Cook*, 581 S.W.3d 278 (Tex. App. 9th 2019) ...................................... 17

*Troice v. Proskauer Rose LLP*, 2015 U.S. Dist. LEXIS 36672 (N.D. Tex. Mar. 4, 2015) .........26

*United States v. Ashley,* 555 F.2d 462 (5th Cir. 1977)..........................................................29

*United States v. Chagra,* 638 F. Supp. 1389 (W.D. Tex. 1986) .............................................29

*Upjohn Co. v. Freeman*, 885 S.W.2d 538 (Tex. App. 5th Aug. 26, 1994) ..............................13

*Wilcon v. Travelers Indem. Co.*, 654 F.2d 976 (5th Cir. 1981) ...........................................8,10

**FACTUAL BACKGROUND**

David Blank was the owner of a jewelry retailer called Diamond Consortium, Inc. d/b/a The Diamond Doctor ("Diamond Doctor"). From at least 2013 to 2015, the Diamond Doctor sold a large volume of diamonds that had been overgraded and fraudulently certified by EGL. Compl., Dkt. 1, ¶ 19. Diamond Doctor was not alone in taking advantage of the EGL scam. Other retailers, including Diamonds Direct also sold large volumes over overgraded EGL diamonds. *Id.* at ¶ 40. The EGL scam came to a head in 2014, when Brian Manookian began filing consumer lawsuits directed at this practice, and jewelry industry leaders called for an end to EGL. *Id.* at ¶¶ 28-34.

On April 17, 2015, Manookian announced that he would be filing class action lawsuits against prominent retailers that had sold large amount of overgraded diamonds. *Id.* at ¶ 41. At this same time, Diamonds Direct was negotiating to be acquired by Blackstone and was concerned that it would be targeted by a class action by Manookian. *Id.* at ¶ 42-43. Diamonds Direct sought to prevent Manookian from filing a class action against it by pre-emptively reaching out to Manookian and retaining him on an ongoing basis for a price in excess of the market rate for legal services. *Id.* at ¶¶ 44-46.

In October 2015, Manookian began an internet solicitation campaign for customers who had been scammed by Diamond Doctor. *Id.* ¶ 37-38. Blank and Diamond Doctor initially responded by making bad faith bar complaints and initiating frivolous bar complaints against Manookian, and when that was unsuccessful, Blank attempted to effectively bribe Manookian to stop the solicitation campaign and to not pursue consumer claims against Diamond Doctor. *Id.* at ¶¶ 49-54. Manookian entertained, but ultimately turned down, Blank's offer. *Id.* at ¶ 55.

After Manookian turned down Blank's offer, Blank pivoted to another bad faith strategy to prevent having to face the possibility of defending against consumer litigation on the merits and

1

through normal processes. *Id.* at ¶¶ 56-59. Blank began making knowingly false allegations that Manookian had "extorted" him by demanding that the Diamond Doctor retain him. *Id.* ¶ 56.

Hammervold was not involved in either Manookian's solicitation campaign or any discussions between Manookian and Blank, but Hammervold drew the attention of several jewelers by filing lawsuits against Mervis Diamond in Maryland. These suits were seen as a significant threat to other jewelers who had sold large volumes of EGL diamonds, including Diamonds Direct and Diamond Doctor. *Id.* at ¶ 71.

In response to the Mervis lawsuits, another jeweler had a PR firm prepare a memo that was ultimately became known as the "plan of attack" against both Manookian and Hammervold. *Id.* at ¶¶ 72-74. The memo recommended jewelers to take "collective action" to invalidate Manookian and Hammervold including through demand letters, lawsuits, media campaigns and bar complaints. ¶ 72, ex. 6. The memo was sent to Blank in an email with the subject line "Plan of attack" that stated: "Collectively we need to work together on this issue." *Id.* ¶ 73, Ex. 7. Diamond Doctor's COO responded to an email forwarding the "Plan of Attack" by  commenting: "This is exactly what we were talking about Friday. Let's fight!!!!!!!!!!!!!! Get them all together and let's get that united front. We also need to set forth plan B." *Id.* Blank sent the memo to Mervis stating that he was going to sue Manookian to "have him start spending money." *Id.* at ¶ 74, Ex. 8. Blank encouraged Mervis to help him because it "would also help" Mervis against the consumer lawsuits Hammervold was pursuing. *Id.* Diamonds Direct was also among the jewelers Blank apprised of the "plan of attack." *Id.* ¶ 75.

In February 2016, Blank sued Manookian under RICO and for other causes of action. *Id.* ¶ 76. The gravamen of the lawsuit was Blank's bad faith claim that Manookian had extorted  him by demanding that Diamond Doctor retain him for millions of dollars. *Id.* ¶¶ 76-78. Fundamental

to Blank's lawsuit was the premise that it was illegal and wrongful for a lawyer to solicit or accept money just to go away. *See id.* ¶¶ 77-78. However, Blank's lawsuit was a complete sham because it was filed to accomplish the very act Blank was claiming was wrongful: the paying off of a lawyer to keep quiet and go away.

Between February and May 2016, Blank began having discussions with Diamonds Direct about Diamonds Direct acquiring the Diamond Doctor. *Id.* ¶ 82. Diamonds Direct was very interested in purchasing the Diamond Doctor, but was concerned about the threatened litigation by claimants represented by Hammervold, and the potential for Hammervold to file a class action lawsuit, or to represent additional claimants against Diamonds Direct in future lawsuits. *Id.* ¶ 84. Blank and Diamonds Direct discussed ways that Blank could seal-off Hammervold from representing claimants in future suits in order to address this concern. *Id.*

On May 22, 2016, Blank gave an interview to the Dallas Morning News about his claims that Manookian had extorted him. *Id.* ¶ 86. Blank characterized the deal he actually proposed to Manookian as "hush money" and claimed he did not go through with it on principle. *Id. Five* days later, on May 27, 2016, Blank proposed to Manookian the same type of deal he was claiming was illegal in his pending lawsuit, but in this iteration, it was a "settlement" agreement, instead of a "retainer." *Id.* ¶ 87-88. Critically, Manookian had to "[a]gree not to bring or be part of any claims against The Diamond Doctor in the future" and *lie* to prospective clients, by telling them "something along lines of, 'Diamond Doctor did no wrong when we checked claims against them, but they will exchange your diamond for you.'" *Id.* ¶ 87.

Negotiations apparently hit a snag between Blank's attorneys and Manookian's attorneys because Blank had been incorrectly assuming Hammervold would be subject to the deal. *Id.* ¶ 90. Blank and Diamond Doctor wanted Hammervold to be part of the "lawyer payoff" deal to make

the EGL claims go away because Hammervold was representing claimants in threatened consumer cases against the Diamond Doctor. *Id.* ¶ 83.

On June 2, 2016, Blank's attorney had a call with Hammervold to attempt to include Hammervold and his clients in a "global settlement." *Id.* ¶ 92. Blank's attorney repeatedly told Hammervold that Blank would only be willing to settle Hammervold's claims if Hammervold could agree that he would not represent any future claimants against Diamond Doctor. *Id.* ¶ 92. Hammervold recorded the call and a full transcript of the conversation is attached to the Complaint as Exhibit 11. Hammervold communicated to Godwin that he could not agree to Diamond Doctor's demand that he agree not to accept any future claimants against Diamond Doctor. *Id.* ¶ 93.

After Hammervold communicated this, Blank and Diamond Doctor did not give up on trying to "seal off" Hammervold with an illegal agreement. *Id.* They continued to look for another way to achieve this unlawful end. *Id.*

In September 2016, Defendants added Hammervold as a defendant to their lawsuit against Manookian. *Id.* ¶ 100. They did so with malice and without probable cause. *Id.* ¶ 155-156.

Sometime in October or November 2016, Blank and Diamonds Direct finalized Diamonds Direct's acquisition of the Diamond Doctor. *Id.* ¶ 105. In connection with this deal, Diamonds Direct and Diamond Doctor agreed and conspired that Diamond Doctor would use the federal lawsuit as leverage to intimidate Hammervold into agreeing not to solicit or pursue any future claims against either Diamonds Direct and Diamond Doctor. *Id.* To ensure that Diamonds Direct would be included in the benefit of the illicit agreement with Hammervold, Diamonds Direct required and/or paid a premium for Blank to agree to indemnify Diamonds Direct from any future claims by Hammervold and/or his clients. *Id.*

Throughout the pendency of the lawsuit, in furtherance of its conspiracy with Diamonds

4

Direct, Blank and Diamond Doctor continued to demand, as part of any settlement, that Hammervold unlawfully agree not to solicit any future claims against Blank, Diamond Doctor, or Diamonds Direct. *Id.* ¶¶ 110-111, 119, 123, 145. Notably, after Diamond Doctor agreement with Diamonds Direct to pursue the conspiracy, Diamond Doctor began to demand that Hammervold not solicit or pursue claims against Diamonds Direct. *Compare Id.* at ¶ 92 *with* ¶ 123.

On the eve of trial between Defendants and Manookian in their severed case, Defendants reached a settlement with Manookian. *Id.* ¶ 114. In addition to Defendants making a payment to Manookian, the Parties entered an Agreed Permanent Injunction. *Id.* ¶¶ 116-117. In the negotiations leading up to the entry of the injunction, the Defendants asked Manookian to agree and/or facilitate Hammervold releasing all claims against Defendants and agreeing to be subject to the injunction. *Id.* ¶ 116. Since Hammervold would not agree to this, the Defendants wrote the injunction to apply, not just to the Parties, but also "those persons in active concert or participation with [the Parties] who receive actual notice of this order by personal service or otherwise." *Id.* It was a backdoor way for the injunction to apply to Hammervold, without Hammervold agreeing to be bound by it. *Id.* ¶ 146(e).

Throughout the pendency of the lawsuit, Blank and Diamond Doctor continued to demand – as part of any settlement – that Hammervold unlawfully agree not to solicit any future claims against Blank, Diamond Doctor or Diamonds Direct. *Id.* ¶ 119. On January 31, 2018, Defendants even included these requirements in a written settlement demand that is attached to the Complaint as Exhibit 13.

On February 25, 2019, Hammervold met with Defendants' attorney in Chicago to confer regarding pre-trial matters. *Id.* ¶ 135. After the meeting, the Defendants' attorney invited Hammervold to have drinks and brought up settlement. *Id.* ¶ 136. Defendants' attorney stated that

the Defendants were not looking for any money, but only wanted "peace." *Id.* Hammervold responded that he could not agree to limit his practice, as he had said before. *Id.*

The Defendants ultimately dismissed their claims against Hammervold on February 28, 2019 because they knew they were going to lose, due to the pending motions in limine, by directed verdict, or at trial. *Id.* ¶ 142.

After Defendants dismissed their claims, Hammervold filed a motion for attorneys' fees, which this Court denied. Dkt. 9-7. However, in doing so, this Court did not adjudicate the malicious prosecution or abuse of process claims Hammervold has plead against Defendants in this lawsuit. *See id.*

## MOTION STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,'" *id.*, it only requires sufficient factual allegations to "nudg[e] [the plaintiff's] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 555) (citations omitted). But this "does not require 'detailed factual allegations,'" only "more than an unadorned, the-defendant-unlawfully-harmed-me accusation,'" *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 555), that "'give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (*quoting Twombly*, 550 U.S. at 555); *see also* Fed. R. Civ. P. 8.

When evaluating a Rule 12 motion, "(1) the complaint is construed in the light most favorable to the plaintiff, (2) its allegations are taken as true, and (3) all reasonable inferences that can be drawn from the pleading are drawn in favor of the pleader." 5B Charles A. Wright et al., *Federal Practice & Procedure* § 1357 & n.11 (3d ed.) (Rule 12(b)(6)); *see In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007).

A claim may be dismissed based on application of an affirmative defense only "if a successful affirmative defense appears clearly on the face of the pleadings." *Constr. Cost Data, LLC v. Gordian Grp.*, 2017 U.S. Dist. LEXIS 77481, *15 (S.D. Tex. Apr. 24, 2017) (*quoting Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986). However, "a plaintiff is under no obligation to plead against a possible affirmative defense or the possible exceptions to an affirmative defense." *Id.*

## **ARGUMENT**

Diamonds Directs' motion to dismiss should be denied because Hammervold has stated a claim for abuse of process, including by pleading a "special injury," and that claim is not time-barred. Additionally, Hammervold has stated a claim for civil conspiracy.

### I.      **Hammervold has Stated a Claim for Abuse of Process.**

Hammervold has stated a claim for abuse of process because he has alleged that the Defendants used the underlying lawsuit after it was initiated to attempt to accomplish an end that could not lawfully have been achieved through that process: to coerce Hammervold into agreeing not to solicit or represent additional claimants against Defendants. Compl., Dkt. 1, ¶¶

The elements of an abuse of process claim are: "(1) the defendant made an illegal, improper or perverted use of the process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted or improper use of the process; and (3) damage to the plaintiff as a result of such illegal act." *Bossin v. Towber*,

894 S.W.2d 25, 33 (Tex. App. 14th 1994). "Texas has generally recognized a cause of action for abuse of process where the original process . . . has been abused to accomplish an end which is beyond the purview of the process and compels a party to do a collateral thing which he could not be compelled to do." *Id.*

The "critical aspect" of abuse of process "is the improper use of the process after it has been issued." *Jordan v. Jordan*, 2001 Tex. App. LEXIS 5106, *6 (Tex. App. 5th Jul. 30, 2001). The key inquiry on this issue "is whether the procedure at issue was used not to enforce some legal remedy that the process was designed to afford, but was instead used to force the plaintiff to do some collateral thing which he could not legally and regularly be compelled to do." *Wilcon v. Travelers Indem. Co*., 654 F.2d 976, 982 (5th Cir. 1981). "There is, in other words, a form of extortion, and *it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort*." *Id.* (*quoting* W. Prosser, Torts § 857 (1971)); *Liverman v. Payne-Hall*, 486 S.W.3d 1, 5 (Tex. App. 8th 2015) (same).

A settlement offer "becomes an improper use of process where the offer seeks more than objectives commonly sought by claimants who initiate similar lawsuits." *Partrich v. Farber*, 448 Fed. Appx. 526, 529 (6th Cir. Aug. 24, 2011). Such a settlement offer "perverts the regular process because his or her true objective is merely collateral to the suit's proper purpose." *Id.*

In *Dunn v. Koehring Co.,* the Fifth Circuit affirmed a finding of liability for abuse of process in favor of a Contractor plaintiff and reversed the trial court's finding of no-liability for abuse of process as to its co-plaintiff, the Contractor's Attorney. 546 F.2d 1193, 1203 (5th Cir. 1977). The Attorney had obtained a large verdict in a breach of warranty lawsuit filed in state court in favor his client, the Contractor, against a Company. *Id.* at 1196-1197. The Company then initiated, pursued, and/or participated in a myriad of other litigation, both civil and criminal,

against both the Contractor and the Attorney for over a decade, to collaterally attack the breach of warranty judgment and to frustrate collection efforts on same. *Id.* at 1197-1198. The trial court found in favor of the Contractor on its abuse of process claim because the Company had used the filing of various civil actions to cause "delay and harassment" and to "frustrate" collection on the judgment, and had used criminal proceedings against the Contractor "for [its] private gain." *Id.* at 1199. The trial court explained that the Company's "resort to judicial process as a club or form of extortion constitutes abuse of process." *Id.* However, the trial court declined to hold the Company liable for abuse of process as to the Attorney because it found the Company "did not misuse any processes issued" as to the Attorney. *Id.* at 1201. The Fifth Circuit reversed the trial court's finding of no liability because it found that the Company's zealous participation in a criminal prosecution for contempt against the Attorney constituted an abuse of process because the Company's "only reasons for aiding in [the Attorney's] prosecution were either a desire to see [the Attorney] personally punished or to use this prosecution as a means to gain an advantage in the Mississippi suit for breach of warranty, [but] [e]ither reason would be a use of criminal process to accomplish an ulterior purpose for which it was not designed." *Id.* at 1203.

Diamonds Direct only challenges the first element of Hammervold's abuse of process claim[2] and contends that Hammervold's abuse of process claim should be dismissed because Hammervold has failed to allege that Defendants "used the process in an illegal or perverted manner for which it was never intended." MTD at 20-23. Defendant's argument is patently meritless.

Hammervold has alleged that Defendants used process in an "illegal or perverted manner for which it was never intended" because Hammervold has alleged that "Defendants conspired to

---

[2] Diamonds Direct acknowledges that Hammervold has alleged an ulterior motive, *see* MTD at 21, and does not challenge Hammervold's pleading of damages. *See* Compl., Dkt. 1, ¶¶ 143, 150.

abuse process in the federal case and in the consumer cases to attempt to achieve unlawful objectives, including to pressure and incent Hammervold to provide false inculpatory testimony against Manookian, to use the filed lawsuit as a basis to disqualify Hammervold in the pending consumer cases against Blank and The Diamond Doctor, and to obtain Hammervold's agreement that he would not solicit or pursue any claims against Blank, Diamond Doctor and/or Diamonds Direct." Compl. Dkt. 1, ¶ 109; *see also* ¶¶ 105, 141, 145, 147. "Throughout the case, the [Defendants'] filing [and prosecution] of the lawsuit was never about collecting money, but about creating a mechanism to 'settle' with the defendants for unlawful non-monetary terms that could not be ordered by the Court." *Id.* at 141. Hammervold's Complaint contains incredibly detailed allegations and exhibits supporting his allegations that Defendants used the federal and state court lawsuits to achieve illicit collateral ends that could never be granted in those lawsuits and are not objectives that plaintiffs can ethically include in settlement agreements. *See id.* ¶¶ 87, 88, 92 (and Exhibit 11), 93, 101,  110, 111, 119, 122, 123 (and Exhibit 13), 124, 136.

Diamonds Direct does not address Hammervold's detailed allegations about the myriad ways that the Defendants abused process against him, beyond summarily (and incorrectly) claiming that "[m]aking a settlement offer is not…an abuse of process." MTD at 22; *see Wilcon*, 654 F.2d at 982; *Liverman*, 486 S.W.3d at 5; *Partrich*, 448 Fed. Appx. at 529 (each explaining that abuse of process claims almost always arise from demanding improper collateral considerations to resolve ongoing legal processes in the course of negotiations).

Diamonds Direct cites *Crear v. US Bank* as "illustrative" of its motion to dismiss argument, MTD at 21, but the material distinctions between this case and *Crear* case demonstrate that Hammervold has alleged an abuse of process claim. In *Crear*, US Bank filed a petition to evict Crear from his residence. *Crear v. US Bank, NA*, 2015 U.S. Dist. LEXIS 182434, *1-2 (May 26,

2015). Crear sued US Bank and its attorneys for abuse of process because he claimed that their petition to evict was improper because.[3] *Id.* However, Crear's claim failed as a matter of law because he acknowledged that the defendants had filed the petition to evict for its intended purpose (to evict him). *Id.* at *5. The deficiency that was dispositive in *Crear* is not present with Hammervold's abuse of process claim because Hammervold has specifically alleged that the Defendants abused the previous lawsuit for improper and unlawful collateral purposes – including to obtain Hammervold's agreement that he would not solicit or accept representation of claimants against Defendants – rather than for any legitimate relief that could have been granted had the process concluded in Defendants' favor. Compl. Dkt. 1, ¶¶ 105, 109, 141, 145, 147.

A similar distinction applies to Diamond Direct's inapposite citation to *Baubles v. Beads*. MTD at 22. In *Baubles*, the court found that the plaintiff's allegations failed to state a claim for abuse of process because the plaintiff "[did] not allege any coercive use of the process." 766 S.W.2d 377, 379 (Tex. App 6th 1989). While the plaintiff had alleged that the defendant has "improperly" used process to obtain publicity, to increase its sales, to decrease plaintiff's sales, and to falsely accuse plaintiff of a crime, there was no allegation that the defendant attempted to *leverage* the plaintiff in any way into agreeing "to do a collateral thing which he could not be compelled to do." *Id.* In contrast to *Baubles*, Hammervold clearly alleges that Defendants conspired to abuse process against him "in order to **coerce** Hammervold into entering into an illegal settlement agreement, in which Hammervold agreed to never solicit or pursue claims against [Defendants]." Compl., Dkt. 1, ¶ 147 (emphasis added); *see also* ¶¶ 105, 109, 141, 145.

Since Hammervold has alleged that Defendants used the process of the prior federal lawsuit

---

[3] He claimed that it could not be granted because he had filed a superseades bond. *Id.*

to attempt to achieve an unlawful *collateral* objective, including through attempts to *coerce* Hammervold into agreeing to unethical and illegally restrict his practice, rather than for any legitimate relief available through that process, Hammervold has stated a claim for abuse of process.

## II.    Hammervold's Abuse of Process Claim is Not Time-Barred.

In its motion, Diamonds Direct argues that Hammervold's abuse of process claim is time-barred because it was filed more than two (2) years after the *issuance* of the process that Defendants conspired to abuse. MTD at 18-20. Diamonds Direct's argument has no merit because (1) it fundamentally misunderstands Hammervold's abuse of process claim; and (2) Hammervold has sufficiently pled the "continuing tort" doctrine under the federal pleading requirements and Texas substantive law.

Diamonds Direct's argument that an abuse of process claim accrues when process is *issued,* cannot be true because the *sin que non* of an "abuse of process" claim is the misuse of process *after* it process has already been issued. *See Liverman*, 486 S.W.3d at 5 ("The critical aspect of this tort is the improper use of the process after it has been issued."); *Bossin*, 894 S.W.2d at 33 ("It is critical to a cause of action for abuse of process that the process be improperly used after it has been issued."). Indeed, "[i]f wrongful intent or malice caused the process to be issued **initially**, the claim is instead one for malicious prosecution." *Bossin*, 894 S.W.2d at 33 (emphasis added).

Hammervold alleges that "***throughout*** the pendency of the lawsuit, Blank and Diamond Doctor ***continued to demand*** – as part of any settlement – that Hammervold unlawfully agree not to solicit any future claims against Blank, Diamond Doctor or Diamonds Direct." Compl., Dkt. 1, ¶ 119 (emphasis added), *see also* ¶¶ 122, 141, 145, 152. Hammervold also alleges that he incurred damages throughout the underlying lawsuit due to the Defendants' continuous abuse of process. *Id.* at ¶¶ 143, 150.

12

Under the "continuous tort" doctrine, the two-year statute of limitations on Hammervold's claim arising from Defendants' continuous abuse of process only began to run on February 28, 2019, when the Defendants finally ceased abusing the process of the federal lawsuit.[4] *See Upjohn Co. v. Freeman*, 885 S.W.2d 538, 542-543 (Tex. App. 5th Aug. 26, 1994); Compl., Dkt. 1, ¶ 152. Under the "continuous tort" doctrine, a "cause of action for a continuing tort does not accrue until the defendant's tortious act ceases." *Upjohn Co.*, 885 S.W.2d at 542.[5] To demonstrate a "continuous tort," the plaintiff must allege "not only continuing wrongful conduct, but continuing injury as well." *Id.* "In a continuing-tort case, the wrongful conduct continues to effect additional injury to the plaintiff until that conduct stops." *Id.* As such, so long as a defendant's conduct continues effecting injury upon a plaintiff,  the plaintiff's "cause of action for damages [is] not complete and [does] not accrue until the wrongful conduct ended." *Id.* at 542-543. This rule prevents a plaintiff from having to file a "multiplicity of suits" for a continuing tort. *Id.* at 542.

The liberal federal pleading standard determines whether Hammervold has sufficiently pled the continuing tort doctrine at this stage of the case. "While Texas law supplies the applicable statute of limitations in this diversity case, federal law governs the pleading requirements of a case in federal court." *Tarpley v. Texaco, Inc.,* 1998 U.S. Dist. LEXIS 3482, *5 (N.D. Tex. Mar. 16, 1998). The "continuing tort doctrine. . .need not be specifically pleaded in federal court." *Id.* at *5-6. "Under Rule 8 of the Federal Rules of Civil Procedure, it is enough that Plaintiff plead sufficient facts to put the defense on notice of the theories on which the complaint is based." *Id.*; *see Howard v. CitiMortgage,* 2014 U.S. Dist. LEXIS 167842, *21 (S.D. Miss. Dec. 2, 2014) ("the Court finds

---

[4] Hammervold's Complaint not only alleges that Defendants consistently abused process throughout the case, *see* Dkt. 1 at ¶¶ 119, 122, 141, 145, 152, but also that the Defendants' latest attempt to coerce Hammervold into an illicit agreement restricting his practice occurred on February 25, 2019, just days before the Defendants finally abandoned this settlement posture and dismissed the case. *Id.* at ¶¶135-136.

[5] This is consistent with Diamonds Direct's citation of *Gatheright v. Clark*, 680 F. App'x 297, 302 (5th Cir. 2017) for the principle that "the cause of action accrues and limitations begins to run upon the **termination** of the acts which constitute the abuse complained of. . ." MTD at 17 (emphasis added).

that the Plaintiffs have not pled themselves 'out of court' and [defendant's] request for dismissal 'on the basis of limitations at the pleadings stage' is denied. Whether the Plaintiffs' claims are, in fact, timely via the continuing tort doctrine or some other ground is not being decided today. These issues may be revisited following the development of the facts through discovery and upon summary judgment briefing."); *see also Constantin Land Trust v. Epic Diving & Marine Servs.*, LLC, 2012 U.S. Dist. LEXIS 63645, *8 (E.D. La. May 4, 2012) ("Constantin alleges that EPIC committed trespass and negligent acts on plaintiff's property that 'continued through January of 2012.' At this early stage of these proceedings, plaintiff has stated a claim for a continuing violation sufficient to survive a pleadings challenge on the basis of prescription.").

Hammervold alleges sufficient facts to invoke the continuous tort doctrine and to defeat Diamonds Direct's statute of limitations defense at this stage of the case. Hammervold has alleged that Defendants' abuse of process remained constant and continued throughout the case, from September 14, 2016 through February 28, 2019. Compl., Dkt. 1, ¶¶ 100, 119, 122, 141, 145, 152. The nature of the injury Hammervold suffered due to Defendants' abuse of process was also continuous. *Id.* at ¶¶ 143, 150, 152. Hammervold has sufficiently put the Defendants on notice of his invocation of the "continuing tort" doctrine, including because he specifically alleged:

> The Defendants' conspiracy to abuse process was ongoing and remained continuous until Blank and the Diamond Doctor dismissed their lawsuit against Hammervold on February 28, 2019. Therefore, Hammervold has timely filed this claim. *Id.* ¶ 152.

Diamonds Direct's motion to dismiss does not address the continuous tort doctrine or the sufficiency of Hammervold's pleading of it. MTD at 18-19.

Diamonds Direct's citation to *Aly v. City of Lake Jackson* is inapposite. MTD at 17-18, ¶ 35. In *Aly,* the issue was the accrual date for the statute of limitations applicable to the plaintiff's § 1983 claim for a false arrest. 453 Fed. Appx. 538, 538-539 (5th Cir. 2011). That plaintiff's claim

arose entirely from the city's decision to arrest and charge him on January 26, 2007 in a sting operation organized by the city. *Id.* at 539. In contrast to Hammervold's abuse of process claims in this case, that plaintiff's § 1983 claim was limited to conduct that occurred on a single date, January 26, 2007, and did not continue thereafter. *Id.* Indeed, the plaintiff in *Aly* expressly "stipulated" that he was not pursuing a malicious prosecution or false improvement claim based on the city's actions after his arrest. *Id.*

Even without the benefit of the continuing tort doctrine, Hammervold has still alleged timely claims for abuse of process against the Defendants because he has alleged that the Defendants abused the federal lawsuit to attempt to coerce Hammervold into agreeing to unlawfully agree not to solicit or represent any future claimants against Defendants throughout the pendency of the federal lawsuit, including during a meeting in Chicago that occurred on February 25, 2019. Compl., Dkt. 1, ¶¶ 119, 122, 135-136, 141, 145, 152.

Since Hammervold has stated a timely claim for abuse of process, Diamonds Direct's motion to dismiss should be denied.

### III.    Hammervold has Alleged a Special Injury.

Hammervold's had sufficiently pled a "special injury" for his abuse of process claim because Illinois law should apply to this element, and Hammervold has clearly pled a "special injury" under Illinois law. Alternatively, it is premature to determine this choice of law issue against the pleader at the motion to dismiss stage before discovery, and without an appropriate evidentiary record. Finally, even under Texas law, Hammervold has pled a "special injury."

15

###### a. Illinois Law Should Govern Whether Hammervold Suffered a "Special Injury" or "Special Damages" Due to Defendants' Abuse of Process.

This Court should apply Illinois law to determine whether the Hammervold has alleged damages constituting a "special injury" or "special damages" because Illinois has the "most significant relationship" to this specific issue.

Although Hammervold gave notice to Defendants in his Complaint that Illinois law should apply to the "special injury" issue, *see* Compl. Dkt. 1, ¶ 158(a), Diamonds Direct's motion to dismiss does not address this, or any other choice-of-law issue. Hammervold agrees with Diamond Doctor and Blank[6] that the "most significant relationship" test governs this choice of law issue, and the restatement factors outlined in § 6 and § 145 of the Second Restatement of Conflicts of Law should be weighed to determine the choice of law for Hammervold's claims. MTD at 10-11. However, the "most significant relationship" choice-of-law test must be applied *by issue* – not by case, party, or claim – and therefore "the law of one state may govern one issue in the case and the law of a different state may govern another." *Energy Coal S.P.A. v. Citgo Petroleum Corp.,* 836 F.3d 457, 459 (5th Cir. 2016); *see* Second Restatement of Conflicts of Law § 155 (recognizing a a different state may have a "more significant relationship" "with respect to [a] particular issue" than the state where the malicious prosecution was filed).

Illinois law should apply to the "special injury" issue because Illinois has the "more significant relationship" to this issue based on the § 6 and § 145 Restatement factors.

A state's laws regarding which types of damages are compensable "balances the need to compensate the plaintiff against the goal of protecting resident defendants from undue liability and excessive litigation." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 849 (Tex. 2000). The "special

---

[6] *See* Dkt. 9 at 7-8.

injury" or "special damages"[7] rule involves a balancing of these same policy considerations. *See Cult Awareness Network v. Church of Scientology Int'l*, 177 Ill. 2d 267, 279 (Ill. 1997) ("A common theme with respect to the special injury rule which runs throughout all of this court's opinions on the subject. . .is this court's recognition of its responsibility to maintain a proper balance between the societal interest in preventing harassing suits and in permitting the honest assertion of rights in our court rooms. . . .As our case law amply demonstrates, it is this balance which lies at the heart of the special injury rule.").

"For purposes of damages under the most significant relationship analysis, 'under Texas law, the most important factor is not where the injury occurred but rather where the plaintiff is domiciled.'" *Toyota Motor Co. v. Cook*, 581 S.W.3d 278, 289 (Tex. App. 9th 2019) (quoting *Bain v. Honeywell Int'l, Inc.,* 257 F. Supp. 2d 872, 878 (E.D. Tex. 2002).

Hammervold is an Illinois domicile, and he suffered the damages constituting his "special injury" or "special damages" principally, if not entirely, in Illinois. Dkt. 20, ¶ 2. Since these factors are the "most important" in selecting the choice of law for the "special damages" issue, and they weigh in favor of Illinois law, Illinois law should apply. *See Cook*, 581 S.W.3d at 289.

Other facts and restatement factors also weigh in favor of applying Illinois law for the "special injury" or "special damages" issue, particularly as to Diamonds Direct.

While the process that Defendants conspired to abuse was issued in Texas, it was served on Hammervold at his home in Illinois, and the Defendants' abuses of process were directed towards Hammervold in Illinois. Dkt. 20, ¶ 3, 6, 9. Defendants conspired to abuse process because they "sought to use the civil lawsuit to prevent Hammervold from soliciting and prosecuting

---

[7] Texas courts currently use the terms "special injury" and "special damages" interchangeably. *See e.g. Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 207 (Tex. 1996). This element for a malicious prosecution claim used to be described as "damages conforming to the legal standards under Texas." *Martin v. Trevino*, 578 S.W.2d 763, 766 (Tex. App. 1978).

consumer claims against Blank, The Diamond Doctor, Diamonds Direct, and/or other Jewelers Mutual insureds." Dkt. 1 at ¶ 158(d). Since Hammervold was based in Illinois, the illicit restrictions that the Defendants sought to coerce Hammervold into accepting were primarily directed toward Hammervold's conduct in Illinois. Dkt. 20, ¶ 9. Likewise, the illicit benefits Defendants sought to obtain from Hammervold would not just be enjoyed in Texas, but anywhere they could be subject to a lawsuit by a future claimant represented by Hammervold. *Id.* ¶¶ 5, 7. Hammervold has also alleged an act in furtherance of the abuse of process occurred in Illinois. *See* Dkt. 1, ¶¶ 135-136.

Diamonds Direct is a North Carolina-based company, with locations in thirteen different states. Dkt. 1 ¶ 39; Dkt. 20 ¶ 7. Diamonds Direct's co-Defendants' relationship with Hammervold was also not limited to Texas. Jewelers Mutual is a Wisconsin-based insurance company that operates nationwide, including in Illinois. *See* Dkt 1, ¶ 6. By August 2016, Hammervold was pursuing diamond overgrading claims against Jewelers Mutual insureds in multiple states, including in Illinois. *Id.* ¶ 96; Dkt. 20, ¶ 4. Diamond Doctor was a Texas-based jewelry retailer and David Blank a Texas resident, but Diamond Doctor did business across the country, including by shipping jewelry to customers located in various states. Dkt. 20, ¶ 5. Blank and Diamond Doctor's lawsuit against Hammervold was targeted to his conduct in Illinois. *Id.* ¶ 8. Blank and Diamond Doctor characterized Hammervold's actionable conduct at issue in their lawsuit as his "willingness and availability to prosecute and acceptance of representation of parties in suits against targeted jewelers is part of Manookian's overall scheme to extort jewelers," and rejected the notion that their claims were based not communication or action Hammervold undertook "regarding the over-grading of diamonds in the state court lawsuits against the Diamond Doctor" (in Texas). *See* Dkt. 21-1 at 18.

While Jewelers' Mutual and Diamond Doctor chose to file the underlying lawsuit against Hammervold in federal court in Texas, the decision to file suit in that venue was incidental to the Parties' relationship because these Defendants could have sued Hammervold in a number of other venues where personal jurisdiction could be established over Hammervold, including *e.g.,* Illinois, Tennessee, or Florida. The gravamen of Defendant's claims against Hammervold arose under federal substantive law (RICO), based on alleged federal and Tennessee law predicate offenses. *See* Dkt. 9-7 at 26-31, ¶¶ 77-88.

Illinois also has a stronger interest in its "special injury" rule being applied to its domicile's claims under the facts alleged by Hammervold than Texas does because the Illinois Supreme Court has made a specific and policy-driven that the specific type of injury Hammervold suffered must be considered a "special injury." *See Cult Awareness Network*, 177 Ill. 2d at 279. Both Illinois and Texas courts require showing of a "special injury" for malicious prosecution or abuse of process claim because "[o]rdinary trouble and expense, as they arise from the ordinary forms of legal controversy, should be endured by the law-abiding citizen as one of the inevitable burdens which men must sustain under civil government." *Smith v. Michigan Buggy Co.*, 175 Ill. 619, 629 (1898); *see Pitts & Collard v. Schechter,* 369 S.W.3d 301 (Tex. App. 1st 2011) (*citing Smith,* 175 Ill. 619)("These same considerations have been discussed by other state supreme courts adhering to the special injury requirement."). However, the Illinois Supreme Court has addressed the specific type of injury Hammervold alleges and has made a clear policy choice that such an injury is a "special injury" in this context. *See Cult Awareness Network*, 177 Ill. 2d at 279, *see also infra* Section III(c).

Based on the § 6 and § 145 Restatement factors, including those factors that are most crucial to the "special injury" issue under Texas law, Illinois law should govern this element of Hammervold's claims.

### b. Alternatively, it is Premature to Conclusively Decide the Choice-of-Law Issue Against the Pleader at this Stage of the Case Before Any Discovery and Without Any Evidentiary Record.

Even if this Court finds that Hammervold has not conclusively demonstrated that Illinois law applies to the "special injury" element of his claims, this Court should nevertheless reserve its final decision on the choice-of-law issue until an appropriate evidentiary record is presented, because it is premature to determine this choice-of-law issue against the pleader at this time.

The balancing of the restatement factors under the "most significant relationship" test "under Texas law typically requires resolution of factual questions, making the analysis inappropriate in the Rule 12(b)(6) context." *Janvey v. Proskauer Rose LLP*, 2015 U.S. Dist. LEXIS 187809, *9-10 (N.D. Tex. Jun. 23, 2015) (declining to conduct a traditional choice of law analysis at the motion to dismiss stage); *see Floyd v. CIBC World Mkts., Inc.,* 426 B.R. 622, 641 (S.D. Tex. 2009) (Declining to apply Texas' "most significant relationship" test at motion to dismiss stage because it "lacks evidence at this stage of the proceedings to properly analyze all the Restatement factors."); *Blanchard & Co., Inc. v. Contursi,* 2000 U.S. Dist. LEXIS 6672, *14 (E.D. La. 2000) ("The choice of law issue, which is inherently fact-based, is not appropriately determined on a motion to dismiss.")*. see also Leaf Trading Cards, LLC v. Upper Deck Co.,* 2020 U.S. Dist. LEXIS 27780, *5 (N.D. Tex. Feb. 19, 2020) (("[A]t this time, the Court declines to dismiss the counterclaims based on choice-of-law principles. The Court will determine the choice-of-law issue based on the record at trial."); *Southern Audio Servs. v. Carbon Audio, LLC*, 141 F. Supp. 3d 653, 662 n. 4 (M.D. La. 2015) ("In this case. . .the Court will defer its choice-of-law decision until the parties present a factual record sufficient to permit this Court to undertake Louisiana's choice of

law analysis."); *Haynesville Shale Rentals, LLC v. Total Equip. & Serv.*, 2012 U.S. Dist. LEXIS 147297, *2-3 (S.D. Tex. Oct. 12, 2012) ("At this preliminary stage it seems appropriate to await at least some factual development of the case before making choice-of-law determination").

Hammervold has not had a sufficient opportunity to conduct discovery and to present evidence regarding some of the relevant § 6 and § 145 factors for the choice-of-law issue. As a result, this Court should at least defer its determination of the choice-of-law issue until after the Parties have had a fair opportunity to conduct discovery and to present the Court with an appropriate evidentiary record and full briefing on the choice-of-law issues.

### c. Hammervold has Clearly Alleged Damages Cognizable as a "Special Injury" Under Illinois Law.

Defendants have not challenged that Hammervold has pled damages cognizable as a "special injury" under Illinois Law. *See* MTD at 19-22. Hammervold has plead a "special injury" under Illinois law because he sufficiently alleged that the Defendants' malicious prosecution of Hammervold damaged his professional reputation in a manner that harmed his future job prospects and the Defendants "conspired to use [the underlying] litigation 'not to resolve any dispute between the parties but to keep [Hammervold] from engaging in [his] business." Compl., Dkt. 1 at ¶ 158(c),(d).

Under Illinois law, "[w]hile loss of reputation alone is not considered a special damage, loss of reputation that affects one's job prospects has been found to constitute special damages" for both a malicious prosecution and an abuse of process claim. *Rothman v. City of Chicago*, 2003 U.S. Dist. LEXIS 8376, *17-18 (N.D. Ill. May 14, 2003). Here, Hammervold has specifically alleged damage to his professional reputation "in a manner that harmed his future job prospects." Dkt. 1 at ¶ 158(c); *see also* ¶ 143.

The Illinois Supreme Court has also recognized that damages constitute a "special injury" when the defendants have used litigation not to resolve any good faith legal dispute, but to keep the plaintiff from engaging in its business. *Cult Awareness*, 177 Ill. 2d at 284-285. In *Cult Awareness*, a non-profit organization sued the Church of Scientology for malicious prosecution and abuse of process because the Church of Scientology conspired to have seventeen of its members file lawsuits against the non-profit across the country. *Id.* at 269-270. The plaintiff alleged that the lawsuits were filed "to keep plaintiff from engaging in its business of disseminating information regarding religious freedom." *Id.* at 285. The court found that under these circumstances, the injury alleged by the non-profit could not be deemed "ordinary." *Id.* As in *Cult Awareness,* Hammervold has alleged that these Defendants filed the underlying lawsuit "not to resolve any legal dispute, but to keep [Hammervold] from engaging in his business." Compl., Dkt. 1, ¶ 158(d). Here, Hammervold has alleged that the Defendants filed the lawsuit as a means to prevent Hammervold from engaging in his business of representing consumer claimants against jewelers. Specifically, Hammervold has alleged that Defendants filed and abused the process of the lawsuit to attempt to disqualify Hammervold from representing claimants against Diamond Doctor, to create a conflict of interest to prevent Hammervold from accepting additional representation of claimants, and to attempt to coerce Hammervold into agreeing to an unlawful "settlement" agreement to restrict his practice, so that he could not solicit or pursue representation of claimants against the Defendants. *Id.* at ¶¶ 105, 109-111, 119, 123, 145-147, 158. As such, Hammervold has plead damages cognizable under Illinois law as a "special injury." *Cult Awareness*, 177 Ill. 2d at 285.

### d.  Even Under Texas Law, Hammervold has Pled a "Special Injury."

Hammervold has sufficiently alleged a "special injury" even under the more restrictive Texas standard because Hammervold alleged that (1) in furtherance of the conspiracy to abuse

process, Defendants obtained an agreed injunction that applied against Hammervold; and (2) Defendants' abuse of process was directed towards interfering with his person and his property – not obtaining money from him – and that Defendants succeeded in restricting Hammervold's ability to represent additional claimants against Blank and Diamond Doctor.

To show special damages under Texas law, a plaintiff "must have suffered more than just the 'mere filing of a lawsuit' or 'ordinary losses incident to defending a civil suit, such as inconvenience, embarrassment, discovery costs, and attorney's fees.'" *Columbia Valley Healthcare Sys., L.P. v. Pisharodi,* 2020 Tex. App. LEXIS 806, *22-23 (Tex. App. 13th Jan. 30, 2020) (*quoting Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 207 (Tex. 1996). Instead, there "must be some physical interference with a party's person or property in the form of an arrest, attachment, injunction, or sequestration." *Id.* However, "once the special injury hurdle has been cleared, that injury serves as a threshold for recovery of the full range of damages incurred as a result of the malicious litigation." *Texas Beef Cattle Co.*, 921 S.W.2d at 209.

Hammervold has pled a "special injury" because an agreed injunction that applied against Hammervold was obtained in furtherance of the conspiracy to abuse process. Hammervold has alleged that in connection with their settlement with Manookian, Defendants submitted an Agreed Permanent Injunction that was entered by the Court. Dkt. 1 at ¶ 117-118. This injunction not only applied to the parties who agreed to its entry, but also "those persons in active concert or participation with [the Parties] who receive actual notice of this order by personal service or otherwise." *Id.* at 118. The Defendants were targeting Hammervold with this injunction because they had alleged in the same lawsuit where the injunction was entered that Hammervold was part of an "association in fact" with Manookian and they "function as a unit with a common purpose…." Dkt. 9-7, p. 24, ¶ 72. The injunction was drafted to apply to Hammervold, without

specifically naming Hammervold as a party to it, because the Defendants had requested Manookian agree and/or facilitate Hammervold agreeing to the terms of the injunction, but Hammervold would not agree. Compl. Dkt. 1, ¶ 116.

Diamonds Direct claims that the injunction did not directly apply against Hammervold, MTD at 23, ¶ 47, but Hammervold alleges otherwise. Compl. Dkt. 1, ¶ 116, 118. At this stage of the case, the Court must accept Hammervold's allegations as true and construe them in his favor. *In re Katrina Canal Breaches Litig.*, 495 F.3d at 205.

The Defendants' conspiracy to abuse process against Hammervold also caused him  to suffer "special damages" because the that abuse of process was directed towards interfering with Hammervold's person and property, and caused an actual interference with Hammervold's property because Defendants succeeded in restricting Hammervold's ability to continue accepting representation of claimants adverse to Diamond Doctor and Blank through conflict of interest rules, akin to an effective injunction. Compl., Dkt. 1, at ¶ 158(b)(d); *see ¶* 109-111, 116, 119, 122, 127, 145-147; *see Pisharodi,* 2020 Tex. App. LEXIS 806, *22-23 (restriction of medical admitting privileges due to peer reviews defendant initiated was considered "interference with a property right, akin to an injunction, and therefore satisfie[d] the special damages requirement."). This interference can be considered interference with a "property interest" because  Hammervold had a "property interest" in his unrestricted ability to practice law and undertake representation of clients. *Durham v. Supreme Court of Tennessee*, 2007 U.S. Dist. LEXIS 23252, *12 (M.D. Tenn. Jan. 29, 2007) (recognizing property interest in right to practice law under Tennessee law); *Greening v. Moran*, 739 F. Supp. 1244, 1251 (C.D. Ill. 1990) (recognizing same under Illinois law); *see Pisharodi,* 2020 Tex. App. LEXIS 806, *22-23.

Hammervold has alleged damages cognizable as a "special injury," even if Texas law applies to this issue.

## IV.     Hammervold has Stated a Claim for Conspiracy Against Diamonds Direct.

Hammervold has stated a claim for civil conspiracy against Diamonds Direct because Hammervold has alleged that Diamonds Direct conspired with Blank and Diamond Doctor to abuse process against him.

"[T]o prevail on a civil conspiracy claim against a particular defendant, a plaintiff need only prove that: (1) at least one named defendant committed a tortious act, and (2) the defendant at issue conspired to commit that tort." *ChemTreat, Inc. v. Chemtech Chem. Servs.*, 2007 U.S. Dist. LEXIS 90175, *17 (E.D. Tex. Dec. 6, 2007). The elements for civil conspiracy are "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result*." Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019).

Diamonds Direct challenges Hammervold's pleading of a conspiracy claim against it on the basis that (a) Hammervold has not alleged enough details to show a "meeting of the minds at the outset of the scheme that included Diamonds Direct"; and (b) Hammervold has not alleged an "*unlawful*, overt act by any defendant." MTD at 24 (emphasis in original). These arguments have no merit.

### a.  Hammervold has Sufficiently Alleged the "Meeting of the Minds" Element.

To satisfy the "meeting of the minds" element of civil conspiracy, the plaintiff "must allege that defendants had the 'specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.'" *Samsung Elecs. Am., Inc. v. Chung*, 2017 U.S. Dist. LEXIS 21700, *34 (N.D. Tex. Feb. 16, 2017). A plaintiff must plead facts and circumstantial evidence that, when viewed through the lens most favorable to plaintiff, raises a reasonable inference that

the defendants agreed, expressly or tacitly, to accomplish the unlawful purpose, or to use unlawful means to accomplish a lawful purpose. *See Troice v. Proskauer Rose LLP*, 2015 U.S. Dist. LEXIS 36672, *30 (N.D. Tex. Mar. 4, 2015), *rev'd on other grounds by* 816 F.3d 341 (5th Cir. 2016).

Hammervold has alleged sufficient facts demonstrating a "meeting of the minds" between Diamonds Direct and Diamond Doctor to accomplish an unlawful purpose: obtaining an unlawful agreement with Hammervold prohibiting Hammervold from soliciting for or representing any future claimants against Diamond Doctor and Diamonds Direct. Compl., Dkt. 1, ¶¶ 84, 105.

Diamonds Direct argues that Hammervold's allegations are insufficient to satisfy the "meeting of the minds" element because Hammervold does not allege "what the object of that plan might have been." MTD at 24-25. Diamonds Direct is simply wrong about this. Regarding the object of the conspiracy, Hammervold specifically alleges that "Diamonds Direct and Diamond Doctor agreed and conspired to use the federal lawsuit as leverage to intimidate Hammervold into agreeing not to solicit or pursue any future claims against either Diamonds Direct and Diamond Doctor." Compl., Dkt. 1, ¶ 105; *see also* ¶ 109. Hammervold further alleges that Diamonds Direct "discussed ways that Blank could seal-off Hammervold from representing claimants in future suits" and that Diamonds Direct entered into an explicit agreement with Diamond Doctor sometime in October or November 2016 providing that Diamond Doctor indemnify Diamonds Direct from future claims by Hammervold and/or his clients.[8] Hammervold also alleged that Diamonds Direct had previously used charitably grey-area tactics by retaining Cummings Manookian, for an amount far in excess of the market price of legal services "primarily to 'conflict-out' Cummings Manookian from soliciting or representing clients against Diamonds Direct." *Id.*

---

[8] In the MTD, Diamonds Direct's attorney acknowledges that Diamonds Direct required Diamond Doctor to indemnify Diamonds Direct in connection with the acquisition, *see* MTD at p. 10, n. 15, but makes unsupported representations about the limited scope and supposedly innocent reasons for this agreement.

at ¶¶ 44-45. Before this Fall 2016 agreement, Diamond Doctor demanded that Hammervold limit his practice to no longer pursue claims against just Diamond Doctor, but after this Fall 2016 agreement Diamond Doctor also began to demand that Hammervold limit his practice to no longer pursue claims against Diamond Doctor *and* Diamonds Direct. *Compare* Dkt. 1, ¶ 92 *with* ¶¶ 111, 123.

Diamonds Direct repeatedly complains that many of Hammervold's allegations regarding its involvement in the conspiracy to abuse process are described as based on "information and belief," MTD at 7-11, 24, but the Fifth Circuit has repeatedly recognized that "'information and belief pleadings are generally deemed permissible under the Federal Rules, especially in cases in which the information is more accessible to the defendant." *Johnson v. Johnson*, 385 F.3d 503, 531, n. 19 (5th Cir. 2004); *see Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018).

Diamonds Direct also supports its argument with out-of-context quotes from several cases suggesting that a plaintiff must allege such granular details about a conspiracy that the complaint identify "who was involved," "precisely what the interaction was," and the "specific time or place in which any meeting of the minds took place." MTD at 24. If such a heightened pleading standard were required (it isn't), a plaintiff could never plead the "meeting of the minds" element of conspiracy without the benefit of discovery. In *Berry v. Indianapolis Life Ins.*, the plaintiff's allegations regarding the alleged conspiracy to defraud were entirely conclusory. 608 F. Supp. 2d 785, 793-794 (N.D. Tex. 2009). The court noted that "[t]he only remotely specific allegation of an agreement between American General and any other Defendant is the allegation that 'Consultant Defendants [. . .] proceeded to work together with the Insurance Defendants to further develop and market this purported 412(i) arrangement.'" *Id.* at 794. The language quoted from *Berry* in

Diamonds Direct's motion to dismiss was a prescriptive holding about specific details that must be included in any pleading of a conspiracy claim, but rather, the court's attempt to make sense of the plaintiff's ambiguous allegation that the alleged co-conspirators "work[ed] together":

> This allegation is insufficient to support a conspiracy between American General and Consultant Defendants, as it fails to specify who was involved, precisely what the interaction was or what actions were decided upon, or when any meeting of the minds occurred between those parties or <u>provide factual background to allow an understanding of how 'working together' is equivalent to  a conspiracy to defraud</u>. *Id.* at 794 (emphasis added).

Since that plaintiff's one specific allegation was too ambiguous for the court to understand how it could equate to a conspiracy, the court found there was "no factual support for the element that American General had a meeting of the minds with any other Defendant to do anything in furtherance of committing fraud." *Id.* at 795. Diamonds Direct's quotation of *Patel v. Pac Life Ins.* for the ostensible principle that a plaintiff must identify the "'specific time [and] place in which any meeting of the minds' took place" is equally misleading. MTD at 24. In *Patel*, the plaintiff's vaguely alleged that the defendants conspired "in the late 1990s." 2009 U.S. Dist. LEXIS 44105, *51 (N.D. Tex. 2009). The court observed, regarding this allegation, that "[a] period of several years is not definitive enough in the context of the conspiracy claim as alleged to put any defendant on sufficient notice to be able to defend." *Id.*

Here, Hammervold has alleged that Diamonds Direct and Diamond Doctor began conspiring regarding how to "seal off" Hammervold sometime between February 2016 and May 2016, and culminated an agreement to abuse process against Hammervold sometime in October or November 2016 in connection with Diamonds Direct's acquisition of Diamond Doctor. Compl., Dkt. 1, ¶¶ 75, 82, 84, 105. In contrast to *Patel*, Hammervold has provided the Defendants sufficient notice of the nature and timeframe of the conspiracy. *C.f.* 2009 U.S. Dist. LEXIS 44105, *51.

Diamonds Direct also argues that Hammervold has not sufficiently plead the "meeting of the minds" as to Diamonds Direct because Diamonds Direct was not involved in certain portions of the conspiracy, including its "genesis." MTD at 24. This argument fails as a matter of law because  "it is axiomatic that it is not necessary for each conspirator to have entered into the unlawful agreement at its inception." *United States v. Ashley,* 555 F.2d 462, 467 (5th Cir. 1977). "[A] changing cast of characters does nothing to lessen the fact of one conspiracy. Once the existence of a common scheme of conspiracy is shown, slight evidence is all that is required to connect a particular defendant with the conspiracy." *Id.*

### b.  Hammervold has Sufficiently Alleged the "Overt Act" Element.

Diamonds Direct argues that Hammervold has not alleged an "*unlawful* overt act" because Hammervold has not identified an illegal act by any of the Defendants[9] in furtherance of the conspiracy. MTD at 25-26. This argument clearly fails because (1) the "unlawful overt act" element is satisfied by Hammervold's successful pleading of the underlying abuse of process intentional tort; and (2) even if a criminal act by a conspirator was required to state a claim for a conspiracy to commit an intentional tort (it isn't), Hammervold has alleged sufficient facts to show that Diamond Doctor violated § 18 U.S.C. § 1512(b)(1) in furtherance of the conspiracy.

The conduct constituting the underlying abuse of process tort satisfies the "unlawful overt act" element of civil conspiracy. Conspiracy is a derivative tort. *Parsons v. Deutsche Bank Nat'l Trust Co.*, 2019 U.S. Dist. LEXIS 19978, *17 (N.D. Tex. Jan. 22, 2019). The "overt act in furtherance of the conspiracy" element overlaps with the requirement to plead the underlying tort. *See Id.*; *Davis—Lynch, Inc. v. Moreno,* 667 F.3d 539, 553 (5th Cir. 2012) ("To establish the required 'overt act,' a plaintiff must show that the defendant committed an act that, if done alone,

---

[9] Only one or more conspirator need undertake an overt act in furtherance of the conspiracy. *See United States v. Chagra,* 638 F. Supp. 1389, 1409 (W.D. Tex. 1986).

would give rise to a cause of action."). One conspirator's commission of the intentional tort that was the object of the conspiracy is sufficient to satisfy the "overt act" element required for a conspiracy. *See Parsons,* 2019 U.S. Dist. LEXIS 19978, *17; *Martin v. Tex. Dep't of Protective & Regulatory Servs.*, 405 F. Supp. 2d 775, 799 (S.D. Tex. 2005); *c.f. Bradley v. Phillips Petroleum Co.,* 527 F. Supp. 2d 625, 657-658 (S.D. Tex. 2007) (where plaintiff fails to state underlying intentional tort, conspiracy claim also fails for lack of "unlawful overt act" requirement.").

Even if a plaintiff had to show that a conspirator committed a criminal offense in order to establish the "overt act" element of a civil conspiracy to commit an intentional tort (this is not required), Hammervold's Complaint has still done so. Hammervold alleges that Randy Johnston, as an agent of Diamond Doctor, threatened Hammervold and offered inducements, including indirect payments, to Hammervold based on Hammervold's willingness to provide false testimony against Manookian. Compl., Dkt. 1, ¶¶ 110-112. This alleged conduct constitutes witness tampering punishable under 18 U.S.C. § 1512(b)(1) because Mr. Johnston attempted to "use intimidation," "threated," or "corruptly persuade[]" Hammervold to influence his testimony in an official proceeding.

## CONCLUSION

For the foregoing reasons, Defendant Diamonds Direct's Motion to Dismiss should be denied.

RESPECTFULLY SUBMITTED,

s/Mark Hammervold
Mark Hammervold, IL #6320744
155 S. Lawndale Ave.
Elmhurst, IL 60126
(T) 405.509.0372
(F) 615.928.2264
mark@hammervoldlaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 1, 2020, a true and correct copy of the foregoing filing was served upon all counsel of record via the Court's ECF system.

*/s/ Mark Hammervold*